IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RIWALL P. LE BARS and )
CRISTINA E. LE BARS, )
)
            Plaintiffs, )
)
        v. )     Civil Action No. 12-424
)
UBS AG, )     Chief Magistrate Judge Lisa Pupo Lenihan
)     ECF No. 8 & ECF No. 10
          Defendant. )

## MEMORANDUM OPINION ON DEFENDANT'S MOTION TO DISMISS

## I. CONCLUSION

Presently pending is Defendant UBS AG's Motion to Dismiss, ECF No. 8. For the reasons set forth fully below, said Motion will be denied.   Also pending is Defendant's Request for Judicial Notice, ECF No. 10, which, in light of the substance of this Opinion, will be denied as moot.

## II. CASE SUMMATION

### A. The Le Bars Action

Plaintiffs husband and wife Riwall and Cristina Le Bars (hereafter "Plaintiffs") are a mechanic and housewife, respectively, presently residing in Pennsylvania, and intending to return

1

to France upon Mr. Le Bars retirement.   More than twenty years ago, in 1992, the Le Bars deposited $9,000 of income earned by Mr. Le Bars while still residing in France into a small bank account opened with UBS AG (hereafter "UBS" or "Defendant"). <u>Complaint</u> at para. 25. The Le Bars have historically modest income and no investment/securities education or sophistication. <u>Complaint</u> at para. 25.   UBS is one of the largest financial institutions in the world; it is a Swiss bank and financial investment enterprise of international repute which Plaintiffs allege maintains branches in several locations within the United States, including Pennsylvania, and is a State-licensed and federally-designated "financial holding company", subject to Federal Reserve System and U.S. Department of Treasury regulatory authority, and operating in the United States under the Bank Holding Company Act.   <u>Complaint</u> at para. 7 & 9.   Plaintiffs expressly attest that UBS falsely told them that monies transferred from France to an investment account at UBS' Swiss Branch and remaining in their UBS foreign account were not subject to United States personal income tax or reporting.   <u>Complaint</u> at para. 18 ("The Account Executive for Plaintiff's [sic] in fact advised Plaintiffs that the money being transferred from France would remain in foreign currency and would not be subject to U.S. Tax laws."); <u>see also id.</u> at para.19, 25.

Beginning in the mid to late 1990s, UBS began a large-scale campaign to market to individuals in the United States, assigned specific "new money" U.S. performance goals to its client advisors, and eventually obtained U.S. resident account assets in the billions of dollars. <u>Complaint</u> at para. 9, 11.   In 2001, in response to increasing concerns regarding the failure of foreign financial institutions to report and/or withhold taxes "on U.S. source income paid to foreign bank accounts", <u>Complaint</u> at para. 13, UBS (and thousands of other foreign financial entities) entered into a Qualified Intermediary Agreement (the "QI" or the "QI Agreement") with

the Internal Revenue Service (the "IRS").   Plaintiffs assert that this Agreement required UBS to file an annual 1099 (investment income) Form with the IRS for accounts held by United States residents. See Complaint at para. 15.    Despite this Agreement, UBS never provided a 1099 Form to the Le Bars or otherwise reported their account to the IRS.   To the contrary, Plaintiffs expressly allege that UBS contended that the accounts fell outside its reporting requirements and "often represented [to the Le Bars] . . . upon inquiry – that **no** reporting [by the Le Bars "to U.S. taxing authorities"] was required."   Complaint at para. 23 (emphasis in original).   Cf. Complaint at para. 18 ("UBS also (inaccurately) assured these U.S. clients" that privacy of the accounts "was in compliance with U.S. law").

Thirteen years after the Le Bars' modest initial deposit with UBS, in 2005, Mr. Le Bars inherited a substantial sum of money upon the death of his father in France and invested those funds with UBS, following the UBS account executives' investment recommendations to expand beyond money markets and into particular securities market investments and bringing the total account holdings to approximately CHF 700,000. Complaint at para. 27, 30.[1]   Plaintiffs attest that their UBS account representatives told them the account investments had to be in non-U.S. securities and that the account was not permitted to purchase U.S. securities "because of tax reasons", and Plaintiffs assert that UBS "intentionally led [them] to believe that this measure was intended to maintain the UBS Swiss Account in compliance with U.S. tax law" and that "they had no legal obligation to disclose the UBS Swiss Account."   Complaint at para. 30.[2] See also id. at

---

[1] Cf. Olenicoff v. UBS AG, 2012 WL 1192911, *2 (C.D. Cal. Apr. 10, 2012) (noting that UBS "is a global integrated investment firm").

[2] Compare Defendant's Brief in Support of Motion to Dismiss at 6-7 (discussing QI Agreement and suggesting that UBS account was not prohibited from holding U.S. securities, but that UBS

para. 19 (asserting that UBS's size, expertise and international reputation enabled it to "manipulate the Le Bars with a net of disinformation that left [them] with the firm conviction that . . . there was no obligation to disclose [UBS Swiss Accounts] on their United States tax returns.").   In addition, UBS then solicited and persuaded the Le Bars to borrow additional monies from UBS in the amount of approximately CHF 300,000 at a loan rate of 5% per annum, to qualify for "special investment treatment" available only to investment accounts of $1M CHF or more.   Complaint at para. 28.

On their annual Form 1040 federal individual income tax returns, Plaintiffs indicated (by checking the appropriate box on Form B) that they held foreign accounts, but identified only France and not their UBS Swiss account.   See Plaintiffs' Brief in Reply to Defendant's Supplemental Brief at 2.[3]   Plaintiffs attest that they did so in reliance on the representations made

---

reporting requirements as to U.S. resident accounts were "generally" triggered by U.S. "source income" or the holding of U.S. – as opposed to exclusively foreign – securities; in other words, the reason for UBS' restriction on Plaintiffs' account investments was not for "*tax* purposes" (*e.g.*, maintaining the accounts legal tax exemption, as Plaintiffs allege was represented) but for "*reporting* purposes" (*e.g.*, to avoid unequivocally triggering UBS' reporting obligations under the QI).   Cf. Complaint at para. 23 (asserting that "UBS never filed 1099 Forms or otherwise reported these accounts to the IRS, contending that these U.S.-client accounts fell outside its QI Reporting obligations."); id. at para. 24 ("UBS informed the Le Bars that, so long as [they] did not invest in U.S. securities or the account was held by a foreign corporate entity, the QI reporting obligations were not triggered."); id. at para. 30; id. at para. 49(d) (*UBS "[i]nformed Plaintiffs that [by] investing only in non-U.S. securities . . . . income derived from the investments in the UBS Swiss Accounts" would not be reportable or taxable to the IRS*).   Cf. also Defendant's Brief in Support of Motion to Dismiss at 4 (stating that QI's reporting "obligations *generally* attach only to reportable income on U.S. securities") (emphasis added).

[3] Schedule B to Form 1040 addresses ownership of Foreign Accounts and Trusts in Part III, questions 7 and 8.   Line 7(a) asks if, during the tax year, the taxpayer had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account or other financial account?" and directs the taxpayer to page B-2 "for exceptions and filing requirements"; line 7(b) asks the name of the foreign country.   Instruction page B-2 indicates that reportability of foreign financial accounts "does not apply to foreign securities held

and tax advice given by UBS as to the lawful non-reportability of the UBS investments.   They

further attest that their receipt of taxable/reportable income Form 1099s as to their France

account(s) and *non-receipt* of any Form 1099 from UBS was consistent with/reinforced their belief

that the latter account was, as UBS has told them, not subject to U.S. income tax.   See Plaintiffs'

Response in Opposition to Defendant's Motion to Dismiss (hereafter "Plaintiffs' Response in

Opposition") at 8 (asserting that UBS intentionally did not provide clients such as Le Bars with

1099 Forms because "receipt of that information would expose" it); see also March 27, 2013 Oral

Argument Transcript (hereafter "March, 2013 Argument Transcript").

In 2008, the Le Bars learned – through media coverage – of the United States government's

investigations and efforts regarding the non-reporting of foreign accounts of U.S. residents.   They

contacted their UBS representative(s) and were told there was "nothing to worry about and no

action needed to be taken."   Complaint at para. 29.   See also id. at para. 33 ("Plaintiffs were told

. . . [they] had no legal obligation to disclose the UBS Swiss Accounts").   Public disclosure and

media coverage of income tax violations related to foreign accounts continued to develop through

2009.   The Le Bars assert that they first ascertained that the UBS account had been subject to U.S.

individual income tax reporting when the IRS announced its 2009 Offshore Voluntary Disclosure

---

in a U.S. securities account." Cf. *supra* at 2 (noting UBS' United States presence/operations and
licensing/regulation).   As noted in text, *supra*, the Le Bars reported their France account(s) for
which they received 1099(s).

The Complaint does not further identify – beyond express representations by UBS, non-receipt
of a Form1099, and trust in UBS' stature/international reputation, see *infra* – the basis for the Le
Bars non-reporting of the Swiss account on Line 7(a) in the context of the language of the
exceptions.   As discussed in Section II(B), *infra*, other Courts have found the "clear" language of
Form B significant.   The Court notes, however, in deciding the pending Motion to Dismiss, that it
is the reasonable clarity of the 1040 questions and instructions to particular Plaintiffs in context -
and not to the Court or counsel in the abstract – which weighs in considerations of, *e.g.*, justifiable
reliance.   See *infra*.

Program (the "OVDP").   The OVDP, in which the Le Bars participated, did not involve any

criminal charge against the Le Bars, nor did it include any acknowledgement of scienter or

knowing violation of federal tax reporting obligations; but the Le Bars were required to pay a

non-reporting penalty in excess of $275,000.   <u>Complaint</u> at para. 31.   <u>See also</u> March, 2013

Argument Transcript.   <u>Cf.</u> <u>Roberts v. UBS AG</u>, 2013 WL 394701 (E.D. Cal. Jan. 30, 2013) (case

in which one couple amongst multiple plaintiffs had not previously pled guilty to tax evasion as to

UBS account(s) but – unlike other similar-case plaintiffs - participated in OVDP).[4]

Certain of UBS' executives and other representatives, for their part, were indicated by the

DOJ in November, 2008[5] and UBS entered a Deferred Prosecution Agreement (the "DPA") in

February, 2009, admitting participation (since 2000) in a "scheme to defraud the United States and

. . . the IRS by actively assisting or otherwise facilitating" U.S. taxpayers' establishment of UBS

accounts "in a manner designed to conceal" them.   <u>Complaint</u> at para. 34.[6]   At that time, the

Securities Exchange Commission (the "SEC") filed a complaint against UBS for acting as an

---

[4]  Plaintiffs allege that "a significant percentage of [the UBS account] balance included amounts on
which they had previously paid taxes."   <u>Complaint</u> at 31.   This reference is unclear from the
initial pleadings, given the allegations that Plaintiffs' UBS account funds derived from earned
income in France, a French inheritance, and a UBS loan.   <u>Cf.</u> <u>Complaint</u> at para. 26 ("[T]he Le
Bars paid all income taxes due to the IRS on monies earned in the United States.").

[5]  <u>Cf.</u> <u>Thomas v. UBS AG</u>, 2012 WL 2396866, *2 (N.D. Ill. June 21, 2012) (noting that one "UBS
banker involved in the scheme was sentenced to 40 months' imprisonment").

[6]  The scope of Defendant's admissions in Deferred Prosecution Agreements or plea bargains by
its executives does not, of course, define/circumscribe the potential full extent of its actual
misconduct for purposes of, *e.g.*, the determination of material fact questions in civil litigation.
<u>Cf.</u> Defendant's Brief in Support of Motion to Dismiss at 3 ("[W]hat UBS plead to was *aiding and
abetting* the tax fraud of others, like Plaintiffs.") (emphasis in original).

unregistered broker-dealer and *investment adviser* to thousands of United States clients.   Id. [7]

UBS executive(s) entered into plea agreement(s) with the DOJ admitting to indictment charges,

including that they "*cause[d]*" clients to prepare and file with the IRS false tax returns fraudulently

omitting income earned by U.S. clients from their UBS accounts.   Complaint at para. 22, 35(f-g),

36.   As part of its negotiated agreements with the DOJ, UBS was required to expeditiously close

international/cross-border accounts at its Swiss branch.[8]   In 2009 it therefore "urgently"

liquidated the Le Bars investment holdings and transferred the funds to their account at Credit

Agricole in France at an alleged loss in excess of $200,000.   Complaint at para. 32.

The underlying Complaint incorporates all prior allegations by reference and brings the

following claims: (1) breach of fiduciary duty by acts and/or omissions, (2)

malpractice/negligence by UBS as Plaintiffs' tax and/or investment advisor through, *e.g.*,

knowingly or negligently false affirmative representations or misleading omissions of material

fact; (3) disgorgement of unethical and excessive fees; (4) breach of contract as to implied, oral

and/or written contracts with UBS; and (5) fraud through knowingly false affirmative

representations and intentional omissions of material facts on which Plaintiffs reasonably relied.

Currently pending before this Court is Defendant's Motion to Dismiss, asserting

entitlement to dismissal of all claims as a matter of law on grounds including that (1) Plaintiff's

fraud and negligence claims fail for lack of sufficient allegation of justifiable reliance on alleged

omissions; (2) their fraud, negligence and breach of fiduciary duty claims fail for absence of

sufficient allegations as to "how UBS' participation in the QI Agreement triggered any duties to

---

[7]  This particular UBS scandal (there have been others) also engendered an IRS civil action against
UBS and a U.S. Senate Subcommittee hearing.   See generally Thomas, 2012 WL 2396866, *4.
[8]  Cf. Olenicoff, 2012 WL 1192911, *6 (noting that, under the DPA, UBS paid the U.S.
government $780M and agreed to exit the cross-border business).

Plaintiffs that extended to tax advice"; (3) their breach of fiduciary duty claim fails because they have not sufficiently plead any such duty extending to tax advice; (4) their fraud, negligence and breach of fiduciary duty claims fail for lack of particularity; (5) Plaintiffs fail to plausibly allege breach of any contractual obligations; and (6) disgorgement is a remedy and not an independent cause of action.   See Defendant UBS AG's Motion to Dismiss at 2.

Defendant's primary assertion is that, as in other related claims brought against it, the former-client plaintiffs "cannot overcome the fact that they were willing participants in their own tax fraud and not innocent dupes, as they would have the Court believe."   Defendant's Brief in Support of Motion to Dismiss (hereafter "Defendant's Brief in Support") at 2; id. at 3 ("Boiled down, Plaintiffs want to hold UBS liable for the lies that they themselves told the IRS . .  .").

### B.   Broader Background and Related Cases

As Defendants repeatedly point out, see, e.g., Defendant's Brief in Support at 1, Plaintiffs are not alone in their allegations against UBS.   To date there have been three (3) related cases:

(1)   Olenicoff v. UBS AG et al., 2012 WL 1192911, **1-3 (C.D. Cal. Apr. 10, 2012) –

The first civil action was brought in the Central District of California by Igor Olenicoff, a multi-millionaire real estate developer, with numerous (e.g., over 20) other foreign account investments, and a documented history of tax evasion (including the alleged creation of a Bahaman "sham company" which Mr. Olenicoff "claimed was formed by a Russian agency at the request of Boris Yeltsin") preceding the 2001 opening of his UBS accounts (to which he deposited over $180,000,000).   In criminal prosecution by the United States government, Mr. Olenicoff received a sentence reduction for pleading guilty to "to knowingly and willfully failing to disclose off-shore accounts on his tax returns."   Id. at **1-3.   In granting summary judgment to Defendants as to

Plaintiff's tax evasion claims, Judge Guilford observed that, *given the admissions of his 2007 Plea Agreement*, "[e]ven assuming that UBS gave Olenicoff fraudulent tax advice", it was in these circumstances "a co-conspirator", as Olenicoff could not now claim he was "misled by" or "unwittingly relied on UBS' counsel".   Id. at **1, 4.   See also id. at 4-5 (noting (a) that Olenicoff "paid tens of millions of dollars in back taxes, penalties, and interest for the tax years 1998 through 2004" with the "largest tax deficiency, for $5.2M [for 1998], *before Olenicoff ever opened a UBS account*"; and (b) other evidence of misrepresentations/dishonesty by Olenicoff as to multi-million dollar business dealings) (emphasis added); id. at **9-10 (concluding that Olenicoff's tax claims were "built upon [the] simple premise [that] UBS gave Olenicoff bad tax advice, which [he] believed" and the "major problem with this story" [was that] "Olenicoff had already plead guilty to his crime" and swore he had willfully falsified his tax returns); id. at **10-11 (observing that *Olenicoff was now judicially estopped from claiming justifiable reliance*, a necessary element of fraudulent misrepresentation and concealment, constructive fraud, and negligent misrepresentation).[9]  Cf. also id. at 13 (concluding that related doctrines of unclean hands and *in pari delicto* also bar suit where facts demonstrate plaintiff "is *co-equally responsible* for any damages arising from his tax fraud") (emphasis added).   This Court observes that Defendant's attempt, in the Introduction to its Brief in Support, to analogize this case to the Olenicoff case, for purposes of dismissal as a matter of law, is misplaced.   See Defendant's Brief in Support at 1-2.

 (2)  Thomas v. UBS AG, 2012 WL 2396866 (N.D. Ill, June 21, 2012), *affirmed* Thomas v. UBS AG, 706 F.3d 846 (7th Cir. 2013) –

---

[9]  Cf. id. at 12 ("Olenicoff attempts to dance around the elephant in the room, only to invite it at the end to tango.").

The second action was filed as a putative national class action.   Each of its three named Plaintiffs were individuals who, unlike Olenicoff, had acknowledged no willful tax evasion but had participated in the 2009 OVDP.   Although the District Court dismissed the Complaint largely without prejudice and with leave to amend, the case proceeded to the Court of Appeals.[10]

In February, the Seventh Circuit affirmed the District Court's dismissal in a strongly-worded Opinion.   Thomas v. UBS AG, 706 F.3d 846 (7th Cir. 2013).   In particular, Judge Posner noted the preliminary deficiencies of the Complaint, as to, *e.g.*, an absence of any explication of the choice of law considerations, and moved on to observe that *"[t]he plaintiffs are tax cheats*, and it is very odd, to say the least, for tax cheats to seek to recover their penalties . . . from the source . . . of the income concealed from the IRS."   Id. at 850.   The Opinion states – in setting the basis for its holding - that the Thomas plaintiffs *"might have [been] expected" to argue that "UBS had told them that income earned in [their] accounts was somehow tax exempt and moreover that the accounts themselves were somehow not foreign bank accounts within the meaning of the tax code and so the plaintiffs didn't have to acknowledge having the accounts with UBS" but they did not "make any of these feeble arguments", instead asserting "that UBS was obligated to give them accurate tax advice and failed to do so, but not that it gave them inaccurate,*

---

[10] See, *e.g.*, Thomas, 2012 WL 2396866, *6 (dismissing malpractice/negligence count without prejudice where they alleged UBS was negligent in failing to inform them of tax-reporting requirements but failed to explain – in Complaint or response brief - basis of UBS' duty to disclose information or causal relationship to plaintiffs' failure to disclose the accounts on their tax returns); *7 (dismissing breach of fiduciary duty count without prejudice where largely conclusory allegations neither (a) supported fiduciary duty based on tax-advisor relationship nor (b) causally-related a breach of any investment-advisor relationship to damages); *9 (dismissing without prejudice claims for unjust enrichment maintainable as a cause of action under state law where one-sentence complaint allegation was "threadbare"); *10 (dismissing fraud count without prejudice and for failure to allege with requisite particularity under heightened pleading standard).

*as distinct from no, advice.*" Id. at 850-51 (emphasis added).[11]   The Opinion concludes that UBS

was merely the plaintiffs' bank/debtor, not their fiduciary, and had "no duty to *prevent* [them] from

commiting tax fraud" (as opposed to merely "*letting* [account holders] think . . . [they could] evade

federal tax law successfully", *i.e.*, with UBS' complicity)[12] where (a) the QI Agreement created no

duties/rights between UBS and the plaintiffs (as opposed to, *e.g.*, duties UBS undertook and

breached as to IRS reporting, including provision of Form 1099s); and (b) plaintiffs did not receive

any tax advice from UBS.[13]

     In finding it implausible that plaintiffs were other than willful "tax cheats" who "eventually

'fessed up and paid [what] they owed",[14] the Opinion perhaps presupposes a degree of

sophistication attributable to a typical international off-shore investment client (*e.g.*, an

---

[11]   See also id. at 851(*"[O]ur plaintiffs do not argue that they (or other members of the class) received tax advice from UBS.  They argue rather that the bank should have prevented them from violating the law.*   This is like suing one's parents to recover tax penalties one has paid, on the ground that the parents had failed to bring one up to be an honest person . . . .") (emphasis added).

  Cf. Thomas, 2013 WL 2396866, *1 ("Plaintiffs' central allegation is [that] . . . UBS never filed 1099 Forms, withheld taxes or otherwise reported these accounts to the IRS, contending that [they] fell outside its QI reporting obligations" and "UBS never informed these U.S. clients that they [were] required to report the Swiss accounts to U.S. tax[] authorities."); id. at *11, n. 3 (quoting justifiable reliance argument properly rejected in Olenicoff as: "because [UBS] lied to the U.S. government, [it] did not discover [plaintiff's] lie until later, which led [plaintiff] to pay much more money than if [his] lie had been discovered earlier.   *Whatever UBS chose to do with its QI reporting, that does not make [it] responsible for what Olenicoff falsely and knowingly wrote down on line 7a of his tax statements*") (quoting Olenicoff, 2012 WL 1192911, *12) (emphasis added).

[12]   Id. at 853.

[13]   Cf. Defendant's Supplemental Brief in Support of Motion to Dismiss (hereafter "Defendant's Supplemental Brief") at 1-2 (quoting same and asserting – incorrectly - that "*Le Bars* presents the precise issues that were presented by *Thomas*").

[14]   Id. at 850.

11

experienced, multi-millionaire United States source-income businessman such as <u>Olenicoff</u>) or a highly-educated member of the Federal judiciary.   But while such individuals *would* likely be implausible woodcocks in the springes of a megalithic international bank's business-development tactics, the markedly different personal circumstances of other individuals (*e.g.*, mechanics and housewives of modest finances and education) may warrant different presumptions (or none at all), particularly in the context of dismissal as a matter of law.   In any event, the basis of the Seventh Circuit's Opinion in the <u>Thomas</u> putative class action is both clear and fundamentally distinguishable.[15]

   (3) <u>Roberts v. UBS AG</u>, 2013 WL 1499341 (E.D. Cal. Apr. 11, 2013) –

   This action was filed by five plaintiffs (couples or individuals) and one plaintiff's affiliated foreign corporations.   All but one of the named plaintiffs (Mr. and Mrs. Gubser) pled guilty to tax evasion regarding the underlying UBS accounts.   <u>Cf.</u> discussion of <u>Olenicoff</u>, *supra*.   The case was initially dismissed on Defendant's motion with leave to amend certain claims.   <u>See Roberts v. UBS AG</u>, 2013 WL 394701 (E.D. Cal. Jan. 30, 2013) (noting guilty pleas, creation of "shell company structures" for each plaintiff, complaint's "lump[ing] of multiple defendants", lack of clarity as to "affirmative misrepresentations or concealments", and "lack of sufficient facts to support reliance"*)*.   More recently, the claims of Plaintiffs' subsequent Second Amended Complaint (the "SAC") were also dismissed on Defendant's motion, save for limited negligence and conversion claims.   <u>See Roberts v. UBS AG</u>, 2013 WL 1499341 (E.D. Cal. Apr. 11, 2013).

---

[15] <u>Cf. id.</u> at 851 (equating case, "minus the hanging", to one for bill in equity between quarreling robbers disputing the profits or costs of their crime) (citing <u>The Highwayman's Case</u>, 9 L.Q. Rev. 197 (1893)).

In the Opinion issued in recent weeks, Judge O'Neill concluded (after advising the parties and counsel of (1) the Court's "inability to accommodate the parties and this action" given its caseload and shortage of district judges and staff, and (2) pending consideration for reassignment), in most pertinent part, that: (1) the SAC failed to support the fraud claims where UBS challenged them as "barred by plaintiffs' own fraud" (citing <u>Olenicoff</u> and <u>Thomas</u>, *supra*) and the SAC did not support actual or justifiable reliance where "the distilled allegations are that UBS AG made representations to induce plaintiffs to invest in foreign accounts which plaintiffs failed to report" and plaintiffs unreasonably failed to independently inquire given Line 7a's "clear disclosure requirements"; (2) plaintiffs offered "no meaningful opposition" to dismissal of a constructive fraud claim where the SAC depicted only a banking, rather than a fiduciary, relationship; and (3) the SAC's breach of contract claims remained vague and conclusory and, in essence, could be pursued through limited surviving negligence claim.   <u>See</u> 2013 WL 1499341 at **7-20.

(4)  <u>MDL Request</u> - Finally, the Court notes that UBS' request for centralized transfer of the two pending cases - <u>Roberts v. UBS AG</u>, C.A. No. a:12-00724 in the Eastern District of California and the case *sub judice* - was denied by the MDL Panel.   <u>See</u> <u>In re UBS Offshore Account Litigation</u>, 883 F.Supp.2d 1346 ( J.P.M.L. Aug. 6, 2012).


III.  **STANDARD OF REVIEW**

   A.  **General Standard for Motion to Dismiss**

A Motion to Dismiss under Fed. R. Civ. Proc. 12(b)(6) is an appropriate means of challenging the legal sufficiency of the Complaint.   <u>See</u>, *e.g.*, <u>Sturm v. Clark</u>, 835 F.2d 1009, 111 (3d Cir. 1987).   It is to be granted only where the Complaint fails to set forth facts stating "a claim

to relief that is plausible on its face." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 554, 556 (2007).

<u>See also</u> <u>Ashcroft v. Iqbal</u>, 129 S. Ct.1937, 1949 (May 18, 2009) (citing <u>Twombly</u>, 550 U.S. at

555-57).   In <u>Iqbal</u>, the Supreme Court further explained that "[t]he plausibility standard is not

akin to a 'probability requirement', but it asks for more than a sheer possibility that a defendant has

acted unlawfully."   <u>Id.</u>

Shortly therafter, in <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203 (3d Cir. Aug. 18, 2009), the

United States Court of Appeals for the Third Circuit described the Rule 12(b)(6) standard in light

of <u>Twombly</u> and <u>Iqbal</u>:   "After <u>Iqbal</u>, it is clear that . . . all civil complaints must now set out

'sufficient factual matter' to show that the claim is facially plausible. This then 'allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged.'" <u>Fowler</u>,

578 F.3d at 210 (quoting <u>Iqbal</u>).   The Third Circuit then set forth the following two-prong test to

be applied by the District Courts in deciding motions to dismiss for failure to state a claim:

> First, the factual and legal elements of a claim should be separated.
> The District Court must accept all of the complaint's well-pleaded
> facts as true, but may disregard any legal conclusions. Second, a
> District Court must then determine whether the facts alleged in the
> complaint are sufficient to show that the plaintiff has a 'plausible
> claim for relief.'   In other words, a complaint must do more than
> allege the plaintiff's entitlement to relief. A complaint has to 'show'
> such an entitlement with its facts. . . . This 'plausibility'
> determination will be 'a context-specific task that requires the
> reviewing court to draw on its judicial experience and common
> sense.'

<u>Fowler</u>, 578 F.3d at 210-11 (citations omitted).

## B.   Federal Rule of Civil Procedure 9(b)

Fraud claims must meet the heightened pleading standard of Fed. R. Civ. P. 9(b), requiring

sufficient specificity to provide the defendant notice of the particular misconduct claimed against

it and reduce the number of frivolous suits.   See, *e.g.*, <u>Key Equity Investors, Inc. v. Sel-Leb</u>

<u>Mktg.</u>, 2007 WL 2510385 (3d Cir. Sept. 6, 2007).   A plaintiff is not, however, required to plead

"the date, place or time of the fraud, so long as plaintiff uses an alternative means of injecting

precision and some measure of substantiation into [his/her] allegations." <u>Seville Indus. Machinery</u>

<u>v. Southmost Machinery</u>, 742 F.2d 786, 791 (3d Cir.1984) (holding that Court must apply

heightened pleading standards of Rule 9(b) in accordance with rules underlying purposes - to put

defendant on notice of misconduct alleged and to guard against "spurious charges of immoral or

fraudulent behavior").   <u>See also</u> <u>Martrano v. Quizno's Franchise Co., L.L.C.</u>, 2009 WL 1704469,

*6 (W.D. Pa  June 15, 2009) (same).[16]

### C.   <u>Consideration of Evidence Within Motion to Dismiss Context</u>

In assessing a Motion to Dismiss under Rule 12(b)(6), the Court may consider not only the

factual allegations that appear on the face of the Complaint, but also documents attached to or

submitted with the Complaint, or incorporated into the Complaint by reference, as well as certain

other evidence outside the Complaint/other authentic items of record.   <u>See generally</u>, <u>Pryor v.</u>

<u>Nat'l Collegiate Athletic Ass'n.</u>, 228 F.3d 548, 560 (3d Cir. 2002); <u>Oshiver v. Levin, Fishbein,</u>

<u>Sedran & Berman</u>, 38 F.3d 1380, 1384 n. 2 (3d Cir. 1994).[17]   More specifically, "[i]n resolving a

---

[16]   <u>Cf.</u> Defendant's Brief in Support at 18 ("Fraud must be pleaded with particularity under Rule 9(b), and so do [*sic*] state-law claims sounding in fraud, including breach of fiduciary-duty and negligent misrepresentation.") (citing <u>Odesser v. Continental Bank</u>, 676 F.Supp. 1305, 1314 (E.D. Pa. 1987)); <u>id.</u> at 19 (same).   <u>Compare</u> Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss at 11-12 (asserting that Rule 9(b) does not apply to claims of breach of fiduciary duty or negligence) (citing <u>Rothman v. Specialty Care Netowrk, Inc.</u>, 2000 U.S. dist. LEXIS 15433, *6 (E.D. Pa. 2000); <u>Tatum v. Takeda Pharms. N. Am., Inc.</u>, 2012 U.S. Dist. LEWXIS 151031, **8-9 (E.D. Pa. 2012).

[17] Factual allegations within documents described, identified or incorporated in the Complaint may be considered if the plaintiff's claims are based upon those documents, *i.e.*, if they are central

motion to dismiss pursuant to Rule 12(b)(6), a court generally should consider only the allegations in the complaint, as well as 'documents that are attached or submitted with the complaint, . . . and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" State College Area School Dist. v. Royal Bank of Canada, 825 F.Supp.2d 573, 577 -578 (M.D. Pa. 2011) (quoting Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006)).[18] Cf. Defendant's Request for Judicial Notice, ECF No. 10 (requesting judicial notice of integral documents discussed in pleadings on Motion to Dismiss and in this Opinion, i.e., the federal tax forms and QI Agreement at issue)).   Consideration of such documents need not convert the motion to dismiss into a motion for summary judgment.[19]

## IV.   <u>ANALYSIS AS TO DEFENDANT'S MOTION TO DISMISS</u>

---

or integral. See, e.g., In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (recognizing that documents integral to or relied on in complaint may be considered in motion to dismiss).

[18] See also Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted); Chester Co. Unit v. Pennsylvania Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990); PBGC v. White Consolidated Industries, Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

[19] See, e.g., Branum v. United Parcel Serv., Inc., 232 F.R.D. 505, 506 n. 1 (W.D. Pa. 2005) (citing Rogan v. Giant Eagle, Inc., 113 F. Supp. 2d 777, 782 (W.D. Pa. 2000)); Burkhart v. Knepper, 310 F. Supp. 2d 734, 741-42 (W.D. Pa. 2004).   See also Hercik v. Rodale, Inc., No. Civ.A. 03-CV-06667, 2004 WL 1175734, * 1 (E.D. Pa. May 24, 2004); Tlush v. Mfrs. Res. Ctr., 415 F.Supp.2d 650, 654 (E.D. Pa. 2002) ("[I]n resolving a 12(b)(6) motion to dismiss, a court may look beyond the complaint to matters of public record, including court files and records . . ."). Cf. Olenicoff v. UBS AG et al., 2010 WL 8530286, *5 (C.D. Cal. Mar. 16, 2010) (observing that Courts may take "judicial notice of [the] existence" of other court proceedings with a direct relation to matters at issue, and of pleadings and court orders that are matters of public record).

In addition to its full consideration of the parties' pleadings, on March 27, 2013, this Court held oral argument, at Plaintiffs' request, on Defendant's Motion to Dismiss.   See March, 2013Argument Transcript.

As central to its analysis of Defendant's pending Motion, the Court reiterates that it finds Defendant's analogies to Olenicoff and Thomas, *for purposes of grounding dismissal as a matter of law*, misplaced.   As Judge Guilford noted in his cogent April 10, 2012 Opinion in Olenicoff, a multi-millionaire real estate developer with a long prior history of tax fraud who has *pled guilty to willful fraud as to the very tax returns at issue in his UBS litigation* cannot long dance around his elephant.   See *supra,* Section II(B) (citing Olenicoff, 2012 WL 1192911).   And the Opinion in Thomas expressly premised the appropriateness of dismissal of the putative class action on the named plaintiffs' status as "tax cheats" who did not allege that UBS gave them inaccurate (as opposed to no) advice regarding the reportability or U.S. taxability of their UBS accounts.   See supra, Section II(B) (discussing Thomas, 706 F.3d 846).   These preceding UBS tax fraud cases are therefore manifestly distinguishable from the circumstances *sub judice*.   Cf. also *supra*, Section II(B) (discussing Roberts).   The question here is *not* whether Plaintiffs can "overcome the fact that they" are "tax cheats" and "not innocent dupes".   Defendant's Brief in Support at 2.[20] Rather, it is the critically different and more complex question of whether Plaintiffs have plausibly raised allegations that (1) they were a couple of modest income, education and relative financial savvy, and otherwise tax-law-abiding U.S. residents; who were (2) misled into federal tax

---

[20]   And even if it were, the appropriateness of dismissal as a matter of law on *in pari delicto* or "unclean hands" grounds would remain, in these circumstances, in doubt.   Cf. Olenicoff, 2010 WL 8530286 at *16-17 ( providing Latin maxim from which doctrines derive – *in pari delicto potior est condition defendentis* – and requisite considerations of degrees of fault which flow therefrom).

violations by their trust in and reasonable and justifiable reliance on *UBS' affirmative misrepresentations* (*including specifically as to non-reportability and tax-exempt status of their UBS account*) and omissions; despite (3) the reporting questions, instructions and exceptions of individual Federal income tax Form 1040, Schedule B.[21]   And whether, more particularly, Plaintiffs have plausibly stated each of their claims.[22]   Defendant's attempts to characterize the claims as "all on the theory that UBS failed to 'tip off' Plaintiffs regarding their own tax-reporting obligations" notwithstanding,[23] the actual allegations of the Complaint cannot all be stuffed into this straw man.   See *supra*, Section II(A), Case Summation.

### A.   **Breach of Fiduciary Duty**

The Court concurs with Defendant's observation that its QI Agreement with the IRS did not itself generate a duty to Plaintiffs.   See Defendant's Brief in Support at 14; see also id. at 7; Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss (hereafter "Plaintiffs' Response in Opposition") at 4 ("Defendant's involvement and actions with respect to the QI

---

[21]   See Plaintiffs' Brief in Reply to Defendant's Supplemental Brief at 2 (asserting that "Defendant's imposition of the notorious 'fraud' label fails because Plaintiffs allege that they had a bona fide misunderstanding as to their liability for tax . . .; which misunderstanding was rooted in the *intentionally incorrect tax advice affirmatively given by Defendant* to Plaintiffs on numerous occasions as discussed in detail in Plaintiffs' Complaint . . .") (emphasis added).
   Cf. Roberts, 2013 WL 394701, *6 ("UBS argues that plaintiffs must bear responsibility for their own fraud and related actions in absence of[complaint] allegations that they misinterpreted . . . Line 7a or that UBS AG . . . advised them how to answer tax return questions, or represented that plaintiffs could legally deny existence of their UBS AG accounts").   Compare *supra* (noting alleged misrepresentations by UBS of non-reportability and tax-exempt status of UBS account).

[22]   Cf. Defendant's Brief in Support at 2 (asserting that Plaintiffs do not plead sufficient facts to state claim for any cause of action and "must bear the burden of their own tax fraud").

[23]   Id.

18

Agreement are not the basis of the duties it owed" to Plaintiffs).[24]   It must, however, part ways with Defendant's assertions that Plaintiffs have inadequately pled that UBS acted as a "tax adviser", id. at 17, or have otherwise failed to sufficiently allege a plausible breach of fiduciary duty (as, *e.g.*, an investment adviser).

A breach of fiduciary duty claim turns on: "(1) the existence of a confidential relationship; (2) the defendant's failure to act in good faith and solely for the benefit of the plaintiff with respect to matters within the scope of the confidential or fiduciary relationship; and (3) an injury to the plaintiff proximately caused by the defendant's failure to act." SieMatic Mobelwerke GmbH & Co. KG v. SieMatic Corp., 2009 WL 2526436, at *4 (E.D. Pa. Aug.12, 2009) (citing Baker v. Family Credit Counseling Corp., 440 F.Supp.2d 392, 414–15 (E.D. Pa.2006)); Airgas, Inc. v. Cravath, Swaine & Moore, LLP, 2010 WL 3046586, at *4 (E.D. Pa. Aug.3, 2010).   See also Olenicoff, 2010 WL 8530286 at *19 ("A breach of fiduciary duty in the form of constructive fraud arises from a failure to disclose relevant matters arising from the [fiduciary] relationship."); Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 611 (3d Cir. 1995) (holding that confidential relationship triggers duty to speak when disclosure is necessary to prevent ambiguous/partial statement from misleading).

In general, under Pennsylvania law, a fiduciary relationship exists where the parties have "reposed a special confidence in each another to the extent that [they] do not deal with each other on equal terms." Brandow Chrysler Jeep Co. v. Datascan Techs., 511 F.Supp.2d 529, 538–39

---

[24] Cf. id. at 7 (asserting that Defendant's non-compliance with QI Agreement "support(s) Plaintiffs' claims that Defendant was intentionally engaged in a fraudulent scheme" and sought to induce client reliance through intentional deceptions and misleading statements "in order to advance its own interests", *i.e.*, increased international financial business/market share and profits).

(E.D. Pa.2007) (quoting In re Clark's Estate, 359 A.2d 777, 781 (Pa.1976)); id. at 539 ("The special confidence required of the parties can be satisfied by 'an overmastering dominance on one side, or weakness, dependence *or justifiable trust*, on the other.'") (quoting Clark's Estate, 359 A.2d at 781) (emphasis added).[25]   Thus, in a *business* context, when parties are entering into arms-length transactions, the taking-receiving of business advice generally does not create a fiduciary relationship.   See Basille v. H & R Block, Inc., 777 A.2d 95, 102 (Pa.Super.Ct. 2001) (recognizing that giving business advice may engender confidential relations where the advisor represents himself to be an expert, "reasonably [inspires] confidence that he will act in good faith for the other's interest", and the receivers "by virtue of their own weakness or inability, the advisor's pretense or expertise, or a combination of both, invest such a level of trust that they seek no other counsel").[26] Cf. SieMatic, *supra* (finding no fiduciary duty absent evidence that defendant purported to be an expert or that plaintiff sought counsel of defendant to exclusion of others).   And Defendant correctly observes that (in keeping with this framework for fiduciary duty) banks do not typically owe such duty to their depositors.   See, *e.g.*, Defendant's Motion to

---

[25]  See also eToll, Inc., v. Elias/Savion Advertising, Inc., 811 A.2d 10, 22 (Pa.Super. 2002) (holding that fiduciary relationship is one "involving   . . . the repose of special trust" and "generally involves a situation where by virtue of the respective strength and weakness of the parties, one has the power to take advantage of or exercise undue influence over the other").

[26]  Cf. Defendant's Brief in Support at 19 (asserting that "notably absent from [Plaintiffs'] allegation is a representation that UBS had expertise in *U.S.* banking and tax laws" where Complaint alleges that UBS employees "boasted about their expertise in Swiss banking and tax laws").   The Court observes that such representation is *not* unambiguously absent where the quoted language of the Complaint contains an adjective reasonably read to modify only its noun, *i.e.*, "Swiss banking*" and* "[general, international, unspecified] tax laws".   Cf. also *supra* n. 1 (citation to UBS' status as "a global integrated investment firm"); Plaintiffs' Response in Opposition at 3-4 ("Defendant held itself out as "experts with particular competence in tax matters . . . .") (quoting Complaint at para. 41).

Dismiss at 3, 14 (noting that "the legal relationship between a bank and its depositors is based on contract and is not fiduciary in character") (citing McGuire v. Shubert, 772 A.2d 1087, 1091 (Pa. 1998)).

Plaintiffs do not, however, allege a bank-depositor-debtor relationship as the basis for their claims.   To the contrary, they specifically allege an advisory relationship initiated by UBS on Mr. Le Bars 2005 inheritance from his father (if not before) and broadened with UBS' successful solicitation of a substantial debt incurred by the Le Bars to fund additional investment(s) by their UBS account representatives. They also allege, as detailed *supra*, a tax-advisory relationship. These allegations support a plausible claim of a fiduciary duty owed by UBS.   Cf. Olenicoff, 2010 WL 8530286 at *25 (finding allegations sufficient to state claim for breach of fiduciary duty by UBS where plaintiffs alleged investment and/or tax and investment advice against defendants); Plaintiffs' Response in Opposition at 9 ("Defendant, as an investment adviser, owes a fiduciary duty to the Plaintiffs . . . .") (citing Amendolia v. Rothman, 2003 U.S. Dist. LEXIS 22719, **14-15 (E.D. Pa. 2003)).

Plaintiffs identify specific misrepresentations, including that their UBS account income was – for reasons related to *e.g.,* the source(s) of their investment funds (*i.e.*, foreign/French versus U.S. origin) and/or account restrictions to foreign versus U.S. securities investments - not subject to U.S. federal income tax and, correspondingly, that they were lawfully excepted from reporting on the related federal income tax form.[27]   Plaintiffs allege financial advice, tax advice and UBS

---

[27] Compare Olenicoff, 2012 WL 1192911 at *13 ("Olenicoff is also not arguing that UBS told him that he had no duty to disclose his accounts, because he has already admitted that he knew that was not the case") with Plaintiffs' Response in Opposition (noting that Plaintiffs "relied upon Defendant's affirmative advice that they did not have to disclose their income that originated in France and remained in foreign investments").

reputational and relationship bases for justifiable reliance on UBS' representations of experience and expertise.   The Complaint does not indicate that they sought or received other investment or tax advice related to the funds or accounts at issue. It does assert that they incurred substantial damages as a result of *e.g.*, (a) tax penalties and other consequences flowing from violations of United States reporting and taxability laws applicable to the UBS account, and (b) UBS' sudden liquidation of Plaintiffs' Swiss account and transfer to France as a result of criminal-prosecution negotiations and agreements reached between UBS and United States governmental authorities.[28] These allegations support a plausible claim for breach of fiduciary duty by UBS and dismissal as a matter of law would be inappropriate.   Cf. Plaintiffs' Response in Opposition at 10 (noting that considerations of fiduciary duty in a given case are fact-specific) (citing Stauffer v. Stauffer, 351 A.2d 346, 241-42 (Pa. 1976)).

### B.   Malpractice/Negligence

Defendant's arguments for dismissal of the negligence and fraud claims focuses on Plaintiffs' asserted failure to "plausibly claim justifiable reliance on any supposed silence by UBS."   Defendant's Brief in Support at 11.   But, as explicated *supra*, the Complaint expressly alleges more than silence, and justifiable reliance has been sufficiently pled.   See also *infra* Section IV(E) (discussing fraud claim). Cf. Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Assocs., 39 F.Supp.2d 517, 534 (M.D. Pa. 1999) (observing that "question of justifiable reliance is most appropriately left to the jury").

---

[28] See Plaintiffs' Response in Opposition at 9 (citing Complaint paragraphs as to damages, including "loss of substantial funds during the abrupt transfer of Plaintiffs' account to Credit Agricole Account in Paris, France").

The Court further observes that Plaintiffs have adequately pled the existence of a relationship creating a professional duty of care, a breach of that duty, and proximate causation. <u>See</u> discussion, *supra*.   <u>Cf.</u> Olenicoff, 2010 WL 8530286 at *28 (noting allegations that UBS and other defendants acted as "investment and tax advisors", interpreting "malpractice" claim as one for professional negligence, applicable to many professionals, and discussing additional duty of care of investment advisors).[29]   Plaintiffs have also adequately pled negligence in, *e.g.*, representations.   <u>Id.</u>[30]

## C. <u>Disgorgement of Fees</u>

Defendant moves for dismissal of this claim because "[d]isgorgement is not an independent substantive legal claim in itself; it is a remedy."   <u>See</u> Defendant's Motion to Dismiss at 6 (citing <u>Performance HR, Ltd., Inc. v. Archway Ins. Servs., LLC</u>, 2009 WL 4739381, *5 (E.D. Pa. Oct. 23, 2008); <u>id.</u> at 20 (same).   The Court does not disagree and, as Plaintiffs have pled sufficient facts to state a claim for breach of a duty owed, as to which the proper measure of damages may be disgorgement, the Court will consider this count to be a remedy for a claim

---

[29] <u>Cf. also</u> Restatement (Second) of Torts § 551 (holding that party to business transaction is under a duty to exercise reasonable care to disclose matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading); <u>Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.</u>, 375 U.S. 180, 194, (U.S. 1963) ("Courts have imposed on a fiduciary an affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts,' as well as an affirmative obligation 'to employ reasonable care to avoid misleading' his clients.") (citations omitted).

[30] <u>See also</u> Plaintiffs' Response in Opposition at 5 (noting that defendant is liable for negligent misrepresentation where (a) in course of business or transaction in which it has a pecuniary interest, it supplies related false information; (b) plaintiff justifiably relies on the false information in decision-making; and (c) defendant was negligent in failing to exercise reasonable care necessary in providing the information, *i.e.*, it knew or should have known its truth or falsity) (citing <u>State College Area Sch. Dist. v. Royal Bank of Can.</u>, 825 F.Supp.2d 573, 584 (M.D. Pa. 2011)); <u>id.</u> at 6 (further noting duties of represented experts, and liability for failure to amend negligent omissions subsequently learned to be inaccurate).

related to such alleged breach.   See Olenicoff, 2010 WL 8530286 at *29 (same); Plaintiffs'

Response in Opposition at 15 (concurring and citing same).   Plaintiffs may wish to remove this

separate "claim" should they elect to amend their Complaint; it is not, however, requisite in light of

this holding. Cf. Defendant's Brief in Support at 20 (citing Performance HR, Ltd., Inc. v. Archway

Ins. Servs. LLC, 2008 WL 4739381, *5 (E.D. Pa. Oct. 23, 2008) ("Including a separate claim for

disgorgement is duplicative and unnecessary . . . .")

### D.  **Breach of Contract**

Plaintiffs allege the existence of "implied, oral and/or written contracts" with UBS for

investment and tax advice and services, the inclusion of "unreasonable and oppressive terms", and

that the contracts are "unenforceable and void due to lack of mutuality . . ."   Defendant's Brief in

Support at 20 (quoting Complaint at para. 60, 62).   Defendant asserts the allegations underlying

Plaintiffs' breach of contract claim are "hopelessly vague" and therefore fail to state a plausible

claim under Iqbal and Twombly.   Id.

The Court would have much preferred Plaintiff to incorporate more specific factual

allegations as to this claim, in particular.   It concludes, however, that Plaintiffs have, *in the

context of all other factual allegations of their Complaint*, included assertions sufficient under the

applicable standard – which expressly directs the Court to "draw on its judicial experience and

common sense" - to state plausible alternative bases for breach of contract.[31]

---

[31]  Cf. Plaintiffs' Response in Opposition at 13 (asserting that Plaintiffs entered into written
contracts with UBS when account opened in 1992, when inheritance transferred in 2005, and when
UBS-solicited loan was obtained); id. (further asserting implied contract arising from Defendant's
obligations and corresponding failure to provide "professionally competent tax and investment
advice and services"); id. at 14 (noting that Plaintiffs are, of course, permitted to plead in the
alternative).

### E.   **Fraud**

### 1.   **Justifiable Reliance**

Defendant is entirely correct in observing that justifiable reliance is a necessary element of fraud claims.[32]   The question raised by Defendant's argument is, at bottom, whether Plaintiffs have plausibly alleged that they could and did justifiably rely on UBS' representations as to the non-taxability and non-reportability of their UBS account in light of their particular circumstances.

The Court concludes the Complaint plausibly asserts justifiable reliance where it alleges (a) Plaintiffs' own financial and personal/career attributes and comparative degree of relevant education and experience; (b) reliance on specific, repeated materially and willfully false representations, half-truths and/or omissions by UBS; (c) reliance on Defendant's extensive international reputation and holdings, superior information and related expertise; (d) resultant handling of Plaintiffs' investment funds (comprised substantially of (i) an inheritance from Mr. Le Bars, Senior, and (ii) the investment loan solicited by UBS) by UBS advisers/account executives; (e) Plaintiffs' reporting of their French foreign account(s), for which they received a Form 1099, and non-reporting of their UBS account(s) on their federal income tax returns; and (f) resultant harm to Plaintiffs in, *e.g.*, (1) adverse tax consequences/penalties/interest from voluntarily-disclosed U.S. income tax violations, and (2) investment/financial losses from UBS' own-criminal-prosecution-related liquidation and international transfer of Plaintiffs' account(s).

Pennsylvania law holds that a "recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely, but . . . is not justified in

---

[32]   <u>Cf.</u> Plaintiffs' Response in Opposition at 6-7 (noting that elements of fraud under Pennsylvania law are (a) misrepresentation, fraudulent utterance or non-disclosure; (b) intention that recipient be induced to act; (c) justifiable reliance; and (d) damage as a proximate result).

[reliance] . . . if he knows it to be false or if its falsity is obvious." See Toy v. Met. Life Ins. Co., 928 A.2d 186, 208 (Pa. 2007) (rejecting assertion that clear language of insurance policy made falsity of alleged misrepresentations apparent and holding that question of justifiable reliance on alleged misrepresentations regarding policy's contents was for the jury). See also Howard Med. Inc. v. Temple Univ. Hosp., 2002 U.S. Dist. LEXIS 1599, *11 (E.D. Pa. 2002) (noting plaintiff need only prove "that the defendants had superior knowledge and ability to assess the situation and that the plaintiff relied on the defendants' representations"). Cf. *supra* and Section II(B). The Court concludes that the allegations of the Complaint, read in their entirety and in the light most favorable to the Plaintiffs, raise a plausible fraud claim. See Olenicoff, 2010 WL 8530286 at *18 (observing, in denying 12(b)(6) as to claims sounding in fraud, that allegations, if true, were sufficient to support finding of justifiable reliance and UBS' affirmative defense arguments, such as plaintiffs' own tax fraud, were "better suited to a finder of fact"); Cf. Roberts, *supra*.

      **2.  Particularity of Pleading under Rule 9(b)**

Defendant also argues that Plaintiffs have failed to allege their claims sounding in fraud with the particularity required by Rule 9(b). Given the content of the Complaint set forth at length in Section II(A), *supra*, and the applicable Rule 9(b) standard, also set forth *supra*, the Court disagrees. Plaintiffs have alleged the circumstances of such claims with sufficient context and specificity to put Defendant well on notice of their basis and enable Defendant's response and defense. See *supra*, discussion of applicable standard. Cf. Olenicoff, 2010 WL 8530286 at *20.

**V.  SUMMATION**

Accordingly, as set forth above, this Court has concluded that in light of the facts alleged Defendant is not entitled, under the applicable standard and in consideration of the particular circumstances of the case *sub judice*, to dismissal as a matter of law of any part of the Complaint. *This is not to say* that the Court would not have preferred that Plaintiffs have been more responsive to the Court's inquiries, during the March 27, 2013 Oral Argument, regarding amendment of the Complaint.   Plaintiffs were, however, entitled to stand – as they did - on their assertion that the Complaint was sufficient as initially filed and, ultimately, the Court concurs.   *The Court reminds the Plaintiffs, however, that the strength of their pleadings, and their factual allegations and evidence, will be weighed in quite another balance should Defendants move for summary judgment at a future date*.    At this point in the litigation, the Court concludes that the Complaint raises a sufficient "plausibility" of actionable conduct by Defendant and corresponding entitlement to relief, and sets forth sufficient factual allegations under the applicable standard, as to the potential claims.   Accordingly, it will order that Defendant's Motion to Dismiss be denied. It will also order that, in light of this Opinion, Defendant's Request for Judicial Notice be denied as moot.

/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan
United States Chief Magistrate Judge

Date:   April 29, 2013